Council, whenever you're ready, you may proceed. Yes, thank you, Your Honors. Mr. Heller, may it please the Court. My name is Philip Baldwin and I represent Jack and Angela Houser. This appeal stems from a Richland County decision granting the defendant's motion to dismiss, which was entered on January 1st, 2011. This case is about a pair of grandparents, Angela and Jack Houser, and their attempt to provide a safe and caring environment for the upbringing of their granddaughter, Eve. Eve was born in March of 2010. Her mother, Jade, is the daughter of Angela Houser. Her biological father is Alexander Sparks. Father and mother were never married. On November 4th, 2010, Jade was arrested for possession of meth in Richland County. Richland County, Illinois subsequently appointed Jack and Angela the legal guardians of Eve. Mother was released from Richland County custody in September of 2011 and moved in with Jack and Angela Houser, who continued to maintain their guardianship of Eve while Jade served out her probation. In February of 2014, Jade completed her probation. By the next month, the Housers could see that Jade's behavior had become erratic and they suspected that she had again begun using narcotics. They observed her frequently becoming intoxicated. A month after that, Jade insisted that her boyfriend, Josh Green, be allowed to move in with her and the Housers. Her behavior became so erratic that the Housers moved from their home in Richland County and took up residence at another home in Saline County. With Mother's permission, the minor child made the move with the Housers. Between May and September of 2014, Mother and the Housers began arguing over living conditions at the Richland County home. Although the Housers had allowed Jade and Josh to live at the home rent-free, they were concerned about the fact that the house grew progressively filthier. This confrontation came to a head on September 19, 2014, when Mother filed an emergency order of protection against Jack Houser, alleging that he had threatened her. Although subsequently dismissed, the temporary O.P. forced the Housers to return Eve to her mother. Thereby, after nearly single-handedly raising Eve for the first four years of her life, the grandparents were now prohibited from seeing their granddaughter at all. When the Housers requested the Richland County Sheriff's Department to examine the home in Richland County, the officer reported finding bottles that were filled with urine on the property, moldy food, mold growing in cups, and loaded firearms, including a loaded shotgun, under the minor child's bed. The condition of the home prompted the Richland County Sheriff's Department to initiate a DCFS complaint out of concern for the minor child. In November of that same year, Jade was arrested again, this time for stealing property belonging to the Housers' business. The investigation took place at the parents' subsequent home, and they found no conditions to support the finding at that time. response to your question, opposing counsel was allowed to call as witnesses two of his witnesses, the child's mother, Jade Green. There was an evidentiary hearing on a motion to dismiss? It wasn't clearly stated that way, but that's kind of what it was. What were the only pleadings pending at the time? We had, over a period of a year and a half, submitted, and not us, but prior counsel as well, had submitted a total of four separate petitions for temporary and permanent guardianship. We had subsequently updated our requests to include information that had been brought forth by the child. Justice Goldham-Hirsch asked you what kind of hearing, and my question is, you had a motion to dismiss on file. You had a pleading, they had a pleading, and you're saying that there was evidence taken on a motion to dismiss. That was the only pleading, the only kinds of pleadings on file. That is correct, Your Honor. Okay, go ahead and tell us who testified. I interrupted, I apologize. The respondents was allowed to produce testimony from Jade Green, the mother of the minor child, and Lorraine McFarland, the grandmother, the paternal grandmother of the minor child. Both testified for less than ten minutes. They gave brief statements, answered a handful of questions, and from that, the judge issued his ruling that our parties lacked standing without giving us an opportunity to present over a dozen witnesses that we'd produced to the court over that preceding period of time that we wished to call at an actual evidentiary hearing. Does that answer your question? Not quite. So the ruling was, in effect, granting the motion to dismiss? That is correct, Your Honor. And was it so stated by the trial court? Yes, Your Honor. And on what basis was the motion filed? What was contained in the dismissal motion? The motion to dismiss was based upon the fact it was actually an erroneous claim that the allegations against the respondent were stale, that they were all two or three years old. But, however, the record reflects that that's just patently not true. But was there any issue about standing raised in the motion to dismiss? Not that I can recall, Your Honor. What kind of motion was it, 615 or 619 or combined? It was a, my recollection is that it was a 615 motion, Your Honor. May I return? Sure. Of course. After Jade was arrested for stealing property from the Hauser's business, the courts placed Evie into the custody of the Hausers. That same day or following day, the Hausers filed their first petition for temporary guardianship of Evie, which Richland County subsequently granted. After they received their letters of guardianship, the Hausers filed an emergency supplemental petition for temporary or permanent guardianship of the minor. Although they had temporary guardianship of the minor child, they still encouraged visitation with the mother. And, in fact, in December of that year, Richland County granted the mother significant visitation. In May of 2015, however, the Hausers filed another petition seeking permanent guardianship of Evie. After the five-year-old reported physical abuse at the hands of Joshua Green during one of her court-ordered psychiatric evaluations, abuse which occurred after the courts had returned Evie to Jade and Josh. Was there any DCFS report filed on that that you know of?  In September of 2015, Jack and Angela Hauser filed another emergency petition for temporary guardianship of Evie after Josh Green was arrested and charged with domestic battery. At a subsequent Richland County court hearing on that same day, the circuit court in Richland County appointed Evie's paternal grandmother, Lorraine McFarland, as temporary guardian of the minor child while the charges against Josh Green were processed through the courts. Now, in September of 2016, the Richland County Circuit Court returned physical custody of Evie to Jade Green, terminating Lorraine's guardianship. This proceeding took place without notice to the Hausers. We only became aware of the fact that the paternal grandmother's guardianship had been terminated when they received Jade's motion to dismiss. In December of 2016, in response to Jade's petition to our motion to dismiss, the Hausers again pled for an opportunity to have an evidentiary hearing to determine Jade's fitness to provide day-to-day care of Eve. But on January 20, 2017, a hearing was set to hear that motion to dismiss. At the onset of that hearing, we reminded the judge that our clients had been attempting to provide evidence in support of their cause for over two years at this point. We had subsequently updated our initial complaints with other information as it was revealed by subsequent counseling of the minor child by court-appointed counselors. We had raised other issues and petitions to show cause when a mother refused to take the child to her court-appointed counseling meetings. At that hearing, Judge Stanley raised the issue that Eve, at that time, had been with her mother for several months, and that fitness was therefore indicated by that fact. His statement was that proof appears to be in the pudding. In other words, since no allegations have arisen over the past several months, therefore, there must not be any remaining issues. Our response to that was once Eve had been returned to primary physical custody of the mother, Jade Green, Jade stopped, disallowed any future contact between the child and her maternal grandparents. How would they then be able to know about any additional complaints of abuse when they were essentially shut out of the discussion? When we questioned the direction that the hearing was taking, pointing out that the Housers had not been notified that the judge intended to conduct this fitness hearing, the judge pointed to the fact that respondents' motion to dismiss had raised a standing issue. At that same time, Judge Stanley then asked opposing counsel to elaborate on his standing argument. And that's when testimony from Jade Green and Lorraine McFarland were entered. It's interesting to note that during the testimony of the two individuals that the respondent was allowed to produce, the testimony of mother indicated when questioned about whether or not Lorraine McFarland had raised any issues of cleanliness about the minor child, she responded that Eve had experienced a month-long extreme case of head lice. And when Lorraine was questioned about the child and was asked, you know, did the child show up with proper hygiene, she replied, most of the time. When we went to cross Jade at that hearing, cross-examine Jade at that hearing, we wanted to raise questions about the alleged battery charges brought against Josh Green. However, Judge Stanley closed out this line of inquiry, stating, well, I know there were proceedings related to that, I think, Mr. Josh Green, and the witness as well, to some type of allegation of battery against the child. Those have all been dismissed by the state. Those were allegations only. Unless you are here today to provide proof that those things have occurred, then you need to move on. When we argued our right to question Jade regarding those allegations, the court again stated, well, you're going to need to move on. Those have been dismissed by the court. I'd like to interrupt you here to ask you to address something that's an underlying current that was in the court, some of the court records that the court believes that the Housers have been manipulating the legal system and maybe trumping up some charges, if I could say that. And that may have been reflected in some of its rulings. How do you address that? I mean, you have to be aware that there was some feeling about that because it's reflected in the record. I believe it's clear that Judge Stanley believed that to be the case, and I believe that that's just subject to interpretation of the facts, an issue which he would have had a better understanding of had we been allowed to proceed to a full evidentiary hearing on the issues. So you don't think there was any basis for him to have reacted to that belief? I wouldn't say that, Your Honor. To be honest, this has been a contentious legal battle between the two parties that has gone on for a number of years. As the Housers have attempted to make sure that Evie is taken care of and to access a right to be with her, and her mother has fought aggressively to stymie any opportunity by them to do so. For example, I found it unusual that the court temporarily assigned guardianship to the biological father's grandmother instead of the Housers. Did she even file a petition to be appointed guardian? That's not in the record, Your Honor. The answer is I don't know. Did you explicitly ask for an evidentiary hearing on your allegations and anything that had occurred subsequent to the filing of your petition? We did, Your Honor. As a matter of fact, we specifically requested that on January 20, 2017. And what was the court's response? The court's response was that. Specifically, the court stated. If that's what was ruling on the issue of standing today, and because the mother can properly educate, train, protect, nurture, and stand as ready, willing, and able to do that, per the testimony elicited, solicited today, he shut down our request for an evidentiary hearing summarily, we believe, Your Honor. May I have one more question? Mr. Baldwin, there was an extraordinarily long period of time between when you filed the permanent request for guardianship. And how do you explain that there was no setting? Did you request a setting? Did you continue to request a setting? Were you denied a request for hearing setting? If you would look at the docket entries, you would see that there were numerous continuances, requests for settings, changes in counsel, delays from both sides of this situation. And I have one question as well. Yes, ma'am. We're out of time, right? Go ahead. Did you ever make an offer of proof when you asked about these criminal convictions that had been dismissed? Did you ever make an offer of proof to the court as to what the testimony would have been had you been allowed to pursue that line of questioning? Or not you specifically, but any lawyer. No, Your Honor. We didn't really have the opportunity at that time. But did you request it? We did not, Your Honor. Okay. Thank you, Your Honor. Do we have no more? I don't think we have further questions. Thank you. All right. Thank you, Your Honor. Counsel? Thank you, Your Honor. My name is Ken Heller. May it please the Court, Mr. Baldwin. Paul Howard used to say, and now we get to the rest of the story. The EOP against Jack Hauser was because he threatened to circulate naked pictures of Jade and publish them in his newspaper if she didn't let them have custody of the minor child. The arrest of Jade took place as a result of a conspiracy between a Lawrence County State's attorney, a sheriff, and a police chief. She was arrested at 2 o'clock in the morning on a Sunday night, Monday morning. The Hausers were there, and they gave the child to the grandparents without any process or without involving the Department of Children and Family Services. Is this on the record, Mr. Heller? I'm glad you asked that, Judge. If you look at clause number 16CB863 in the Federal District Court in East St. Louis, you will see a judgment against Angela and Jack Hauser in the amount of $970,000 conspiring to violate Jade's civil rights. What is it again? 16 what? 16CB863. Okay. It was tried in February of this year. The jury awarded Jade $970,000, including a half a million of that in punitive damages as a result of this conspiracy and their violation of her constitutional rights. Give me that one more time. 16CB863. Why didn't you file a motion to supplement the record on that? Well, the briefs had already been done. It's a matter of public record, and it really doesn't go to any issue here. It's just most of what Mr. Baldwin told you in terms of background isn't in the record either. I think you need to know the whole story. You ask about Judge Stanley and his bend on this and the delay, and it all goes to that. Each of the first two times we were to have hearings, the night before the hearings, the Hausers went in and got ex parte orders of protection preventing Josh and Jade from seeing the child. Judge Stanley entered an order saying, no more ex parte orders of protection. If you want something, you come to me. So the next two times, they went to a state's attorney and filed criminal charges. The criminal charges, she was arrested in the middle of the night, was because she gave her mom several months earlier a $200 postdated check, and when they fired her from her job, she didn't have enough money to pay the check, so she was arrested in the middle of the night on a $200 check that she gave her parents. The subsequent arrest is after the Hausers have custody of the child, they arrest Jade because when she gave back the corporate telephone, it didn't have the data card in it. So they had her arrested for that. There's some bad blood going on. There's some really bad blood going on. The big part of the delay was that after Judge Stanley made a ruling contrary to the Hausers, they filed a motion to recuse him for cause because he was prejudiced against them. So we had to have a visiting judge come in, and we had an evidentiary hearing on that, and he determined that Judge Stanley was not prejudiced against the Hausers, and then they filed a motion to reconsider, and we had another hearing on that, and then Judge Stanley came back and heard the case. So you're not getting a lot of the flavor of what was really happening in the court and the lengths that the Hausers were going to to get this child, but what's important in this case is that the petitioners argue in their brief that their rights were violated because they didn't have an opportunity to rebut the presumption that the parents were willing and able to make day-to-day decisions to carry it out. We did have that hearing. That's the hearing we talked about. The motion to dismiss him. That's correct. Was there notice to opposing counsel that that would be a subject of that hearing? It was the only motion pending was the motion to dismiss, and it was based on the fact that Lorraine had taken temporary guardianship because the judge wasn't going to put the child back with the Hausers. She had instituted a visitation schedule to reacquaint Mom with the child, and they set a date by which Mom was to get the child. Mom had the child. The child was living with her. And after a period of time, the hearing that counsel says he didn't get notice of, Lorraine came to the court and she said, You know what, Judge? I don't have the child. I resign. I quit. She had every right to quit as temporary guardian, and the child continued for another six months to be living with Mom, going to school. And so we filed a motion to dismiss saying under the statute, the grandparents who don't have custody don't have standing to proceed. And the judge gave everybody a chance. So you're saying the whole issue was standing? Absolutely. Absolutely, that was the whole issue. And it had been an issue since the beginning of the case. The only reason the Hausers went to these efforts to get the child was so that they could manufacture standing in the first instance. In the brief in the argument section, the defendants say that they're entitled to relief because they didn't have the opportunity to present their case, I assume, meeting the best interest of the minor child. But they don't have a right to get to a hearing on the best interest of the minor child if they don't have standing. That's the whole point of the standing provision of the statute. If the parents are there willing to take, it doesn't matter what the best interest of the child. If I have a child who has a child and they're living below the poverty level and I don't like the neighborhood they're in or they can live somewhere better and I have the opportunity to provide nicer clothes, better school, I can't just say best interest of the minor child. I get guardianship. You've got to prove that there is a problem with the parent not being able to make those day-to-day decisions. And the court had a hearing and was satisfied that, in fact, Jay was capable. And what's interesting is there's not one word in the appellate's brief, not one word saying how Judge Stanley made a mistake in ruling on the evidence that he heard. They don't tell you that his decisions against the manifest way are the evidence. They don't tell you that he erred in making that decision as a matter of law. Their claim is that they didn't get a hearing. But they did get a hearing. We had every opportunity to call witnesses. They presented several witnesses, Jay's sister, as I recall. So to claim that there wasn't a hearing is not true. So they did present testimony. Absolutely. And the court gave them an opportunity to call witnesses. There's no suggestion in this brief that the court abuses discretion in not granting a continuance that wasn't asked for. There's no request or suggestion that the judge erred and ruined on the evidence. It's not in the brief. Counsel now says, well, he wouldn't let us ask questions about unfounded allegations or criminal charges that were dismissed by the state without even going to prosecution. There was no offer of proof. They didn't make a request to make an offer of proof. They didn't ask that the hearing be continued until another date so that they could call some of these witnesses. There was no suggestion that witnesses were unavailable on that date. They put on there two witnesses, the judge ruled, and now they say they don't get a hearing, not that the judge made an error. Under those facts, we believe that the court properly ruled and this court should affirm the judge's ruling. I would like you, we would like you to supplement the record with some information about that federal case. I'd be more than happy to do that. Can you do that within a couple weeks? What would you like? What you think is appropriate to make it clear to us as the reviewing panel what that was about and we can determine its relevancy, if any. And if you could do that in 15 days in counsel, we'll give you 15 days to respond to whatever is produced, including any supplement you feel is appropriate. I'll do that, Judge. Okay. Thank you very much. Thank you, counsel. Counsel? I believe we made clear that this is a longstanding conflict between the parties involved. And over the course of time, a variety of hearings or partial hearings were held. However, if the court reviews the transcript of the January 20, 2017 hearing, you'll see that our statement that we provided no witness testimony for our parties is accurate. And I would urge the court to review that transcript again because you'll see we didn't call Jade's sister. We didn't provide testimony from two other individuals. All of that is just factually not true. Proposing counsel began his discussion in regards to discussing this inflammatory claim by the mother that Jack Hauser intended to publish nude photographs of their daughter in the party's newspaper. That is the allegation which was the basis for the order of protection, for the emergency order of protection, which was summarily dismissed as soon as the Hellers defended themselves in court before a judge on that issue. The Hausers? The Hausers. Yes. Yes. The grandparents. Pardon me. In response to this court's several questions to Mr. Heller about whether information was part of the record or not, the overwhelming answer to most of his statement was that no, that the comments that he made to you were not part of the record. I think he said the comments you made. Well, I think we're both throwing that allegation back and forth at each other, Your Honor. I think that we've enlarged the record substantially. Specifically, though, to address opposing counsel's statement that we wanted at the January 20, 2017, hearing to go into the allegations against the physical violence by Josh Green against the minor child. What did you think was going to take place, though? It's a motion to dismiss the guardianship petition, correct? Because of the time setting and our recent entry into the case, which was just a matter of days or weeks before that date, we believe that this hearing would address issues that the respondent had raised in their petition, that it would be summarily rejected, and then we would get on to scheduling an evidentiated hearing, which we had requested, as we felt was our right. Well, when you got to court and found out the purpose was other than you thought, did you move to continue? Yes. You did? That will be in the record? It will be in the record. We explained that we were not prepared to argue the question of standing at that time, and the judge pushed the hearing through, a hearing which lasted. And you asked for a continuance? Not myself specifically, but our firm, Your Honor. Okay. I would like to point out a part of the statute, Your Honor, which is 755 ILCS 511-5. The statute, as it relates to guardianship, subsection E states that previous statements made by the minor relating to any allegations that the minor is an abused or a neglected child within the meaning of the Abused and Neglected Child Reporting Act or an abused or neglected minor within the meaning of the Juvenile Court Act of 1987 shall be admissible in evidence in a hearing concerning appointment of a guardian of a person or a state of the minor. But that's after the court finds that appointment of the guardian to be in the best interest, correct? No, no, Your Honor. That is in the context of or separate and apart from the best interest standard. So you're saying that can be decided before standing? I'm saying that can be argued in the hearing for standing, which is the first step in determining whether the housers have the right at that time to continue on to present a best interest of the child argument to the court. Doesn't that statute deal with admissibility as opposed to being outcome determinative on the question of standing? I don't understand Your Honor's question. I don't. What you just quoted to us deals with admissibility. Correct, Your Honor. How does that become a factor in determining whether your clients have standing? At the standing argument level, the first step in the process is the burden of the petitioners to prove by preponderance of the evidence that the biological parents are unable to care for their daughter on a day-to-day basis. In support of that proof, subsection E indicates the type of information that can be allowed in that standing hearing argument. Specifically, allowing for the introduction of unsubstantiated allegations. Now, as this court is well aware, criminal charges against defendants are dropped for a multitude of reasons. It doesn't waive the fact that this 5-year-old child said that Josh Green threw her against a wall, that he punched her in the eye, that he committed abuse which led to bruises on different parts of her body. That information should have been allowed to be presented to the court in an evidentiary hearing. Did you ask for an offer of proof? No, Your Honor. Well, how are we as a reviewing court supposed to know that this is what the child said and that this is what you would have offered and this is what would have happened? Well, there was an interplay between the judge and our counsel, which is reflected in the record if the judges would review that portion of the transcript. An interplay saying what? Judge, this is what was said? I mean, it has to be. Yes. Okay. We'll look at the record. All right, Your Honor. Any other questions? I don't believe so. Thank you, counsel. Thank you, Your Honor. We appreciate the briefs and arguments of counsel to take the case under advisement, including the supplement from both of you, and we will issue a ruling in due course. Thank you. Thank you, Your Honor.